# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 12, 2011          Decided August 10, 2012

No. 10-7060

LAURA ELKINS AND JOHN ROBBINS,
APPELLANTS/CROSS-APPELLEES

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES/CROSS-APPELLANTS

Consolidated with No. 10-7069

Appeals from the United States District Court
for the District of Columbia
(No. 1:04-cv-00480)

*Roger J. Marzulla* argued the cause for appellants/cross-appellees. With him on the briefs was *Nancie G. Marzulla*.

*Stacy Anderson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees/cross-appellants. With her on the briefs were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor.

Before: SENTELLE, *Chief Judge*, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Laura Elkins and her husband John Robbins brought suit against the District of Columbia and some of its officials alleging violations of the Fourth and Fifth Amendments. For the reasons set forth below, we conclude that the District and its officials were entitled to summary judgment on all the plaintiffs' claims.

I

In 2001, Laura Elkins[1] decided to renovate her home in Northeast Washington, D.C. Because the house is in the Capitol Hill Historic District, Elkins needed building permits from the District's Department of Consumer and Regulatory Affairs (DCRA), which regulates building construction in the District, and the Historic Preservation Office (HPO), which is charged with protecting the city's historic structures. Elkins obtained permits, but once construction began her neighbors complained. In March 2002, one of them sued Elkins and the District in D.C. Superior Court seeking to halt the renovation. The court dismissed the suit, concluding that the permits were valid. In doing so, the court relied largely on testimony from a DCRA official.

Despite the court's ruling, three other District officials, Denzil Noble, Acting Administrator of the Building and Land Regulation Administration within the DCRA, his predecessor J. Gregory Love, and David Maloney, Acting Director of

---

[1] Throughout this litigation, the parties have referred to Elkins and Robbins collectively as Elkins. We adopt that convention as well.

HPO, still questioned whether the permits were valid and suspected that the construction exceeded their scope. Largely due to their concerns, the District issued four stop work orders[2] and several times requested that Elkins submit revised building plans to reflect the work being done. Elkins disregarded the orders and refused to submit any revised plans. On May 16, 2002, Love, with Maloney and Noble present, instructed Vincent Ford, DCRA's chief building inspector, to "'find a way' to stop work" at Elkins's home. Ford Decl. ¶ 20. The next day, Ford issued Elkins a notice of violation of a stop work order. *See* D.C. MUN. REGS. tit. 12A, § 113.2. Elkins and the District officials continued to clash over the type of permits and building plans necessary to authorize continued construction for several months. On March 10, 2003, Noble sent a letter requesting an on-site inspection, but Elkins refused. In response, DCRA sought from Superior Court an administrative search warrant to inspect Elkins's home for evidence of illegal construction. Noble signed the affidavit in support of the warrant. The affidavit set forth the grounds for DCRA's belief that Elkins's renovations exceeded the scope of the permits and continued despite orders that they stop, all in violation of the D.C. Construction Codes. The Superior Court issued the warrant on March 26, 2003, authorizing a search at Elkins's address for "unlicensed construction work which is in violation of the Construction Codes." The warrant said nothing about items to be seized.

---

[2] A stop work order, which does what its name implies, may issue if "work on any building, structure or premises is being performed contrary to the provisions of the Construction Codes, or the Zoning Regulations or in an unsafe or dangerous manner." D.C. MUN. REGS. tit. 12A, § 114.1. Work beyond the scope of a permit violates the Construction Codes.

The next day officers from the Metropolitan Police Department (MPD) and officials from DCRA and HPO executed the warrant. The DCRA and HPO officials had no training in executing a search warrant. In fact, neither agency had ever conducted a search. After entering Elkins's home, an MPD officer announced they had the right to seize all papers related to the renovation. With that, the party searched the entire home, looking for documents and rummaging through closets, drawers, and boxes. The search included the bedrooms of Elkins's two sick children who were home from school. *Elkins v. District of Columbia* (*Elkins I*), 527 F. Supp. 2d 36, 41 (D.D.C. 2007). After vigorously protesting the fact and nature of the search, Elkins produced a notebook containing construction permits, drawings, invoices, and other documents related to the renovations that Toni Williams-Cherry, an HPO inspector assisting DCRA with the search, took from her. The District returned the notebook to Elkins three weeks later. *Id.* In December 2003, the District moved to revoke Elkins's building permits in proceedings before the District's Office of Administrative Hearings (OAH). *Id.*

In March 2004, while the OAH proceedings were underway, Elkins brought this suit in federal district court against the District, the Mayor, Love, Maloney, Noble, and Williams-Cherry, alleging that the search of her home and the seizure of her notebook violated the Fourth Amendment. She also claimed that the defendants' "outrageous" conduct trampled her Fifth Amendment due process rights. Elkins sought millions of dollars in compensatory and punitive damages from each defendant under 42 U.S.C. § 1983. The district court stayed the lawsuit pending the outcome of the administrative proceedings.

In those proceedings, Elkins moved to suppress the evidence obtained from the search of her home: documents

from her notebook, photos taken, and written accounts from those present during the search. OAH allowed the use of the photos and reports from the search, ruling the search warrant valid because there was probable cause to believe the construction was unauthorized. Pls.' Mot. for Partial Summ. J. Ex. 21 (OAH Order on Motion to Suppress), at 15, 22. But OAH barred the use of the documents from the notebook because the warrant said nothing about seizing them, or anything else. *Id.* at 21-22. After three separate hearings held over several months, OAH upheld the permits on March 20, 2007, *id.* Ex. 20 (OAH Final Ruling), at 45-46, in a ruling that also concluded that Elkins and the District officials had acted in good faith throughout despite charged accusations of misconduct coming from both sides. *Id.* at 21 n.13.

Following the OAH decision, the district court took up Elkins's lawsuit again, addressing the parties' dueling, updated motions for summary judgment. On December 12, 2007, the district court agreed with the District that Elkins was collaterally estopped from pursuing her substantive due process claim because of OAH's determination that the District and its officials had acted in good faith. *Elkins I*, 527 F. Supp. 2d at 50. The district court likewise rejected Elkins's procedural due process claim, finding the OAH proceeding was in fact wholly adequate. *Id.* at 48-49. Addressing Elkins's Fourth Amendment claims, the district court held that both sides were collaterally estopped from relitigating OAH's determinations that the search was lawful and the seizure unlawful. *Id.* at 46. The only issue remaining was which, if any, of the defendants to hold liable for the unlawful seizure of Elkins's notebook. *See id.* at 51-52. Having dismissed the Mayor from the suit (claims against the Mayor in his official capacity are treated as claims against the District), the court rejected the assertion of qualified immunity from the

remaining officials and ordered discovery on the issue of liability. *Id.* at 51.

Following discovery, the defendants moved again for summary judgment, arguing that none of them were liable for the seizure of the notebook. The district court dismissed the District because Elkins had not properly pled any theory on which it could be held liable for the seizure, but denied the motion with respect to the other defendants. *Elkins v. District of Columbia* (*Elkins II*), 610 F. Supp. 2d 52, 58-59 (D.D.C. 2009). On a motion for reconsideration, the court later granted judgment to Maloney, finding there was no evidence linking him to the seizure. *Elkins v. District of Columbia* (*Elkins III*), 636 F. Supp. 2d 29, 33-35 (D.D.C. 2009). Elkins then filed her own motion for reconsideration challenging Maloney's dismissal from the suit and the application of collateral estoppel to her Fourth Amendment claim. The court rejected the motion. *Elkins v. District of Columbia* (*Elkins IV*), 685 F. Supp. 2d 1 (D.D.C. 2010).

Thus, on the eve of trial, all that remained of Elkins's suit were her claims that Love, Noble, and Williams-Cherry were liable for the unlawful seizure of her notebook. To expedite a final ruling and subsequent appeal, Elkins agreed not to proceed to trial. Instead, preserving her right to appeal, she asked the court to enter judgment in her favor against the remaining defendants, but stipulated that she was entitled to no more than nominal damages from each. *See Elkins v. District of Columbia* (*Elkins V*), 710 F. Supp. 2d 53, 60 (D.D.C. 2010). Finally, in May 2010, the district court entered judgment against Noble and Williams-Cherry and assessed nominal damages of one dollar each, but dismissed Love from the case, holding that although the evidence against him was enough to get before a jury, it was insufficient, without a trial, to establish his liability. *Id.* at 62, 65.

Both parties appealed and we assumed jurisdiction under 28 U.S.C. § 1291. Elkins seeks to reverse the district court's grants of summary judgment against her, which would allow her Fourth and Fifth Amendment claims to go forward against all of the defendants. Noble and Williams-Cherry seek to reverse the district court's grant of summary judgment against them and ask for entry of summary judgment in their favor. We review the district court's grants of summary judgment de novo. *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010). Summary judgment may be granted when the evidence, viewed in the light most favorable to the nonmoving party, shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 255 (1986). Applying this familiar standard, and for the reasons below, we grant the defendants all requested relief.

## II

Elkins argues that the district court erred in concluding that the defendants did not abridge her Fifth Amendment rights to procedural and substantive due process. Her argument about procedure, however, suffers from a fundamental flaw. To state a procedural due process claim, a complaint must suggest "what sort of process is due." *Doe by Fein v. District of Columbia*, 93 F.3d 861, 869 (D.C. Cir. 1996) ("[O]ne [cannot] allege a procedural due process violation without even suggesting what sort of process is due . . . ."). Elkins's complaint does not. The section of her complaint titled "Deprivation of Property Without Due Process" says nothing about the process she claims is due, but alleges instead that the defendants "deliberately flout[ed]" the law and "trammeled" Elkins's property rights by engaging in "outrageous" conduct. Compl. 6-9. Such allegations may

make out a claim for a breach of substantive due process, but not a violation of procedural due process.

Elkins's substantive due process claim rests on her allegations that the stop work orders and search of her home were made despite valid construction permits. We have previously held that individuals have a protected property interest in building permits issued by the District. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1073 (D.C. Cir. 2003). Yet "[o]nce a property interest is found, . . . the doctrine of substantive due process constrains only egregious government misconduct." *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003). The "plaintiff must at least show that state officials are guilty of grave unfairness," which requires demonstrating either "a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights." *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988). By contrast, "[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress." *Id.*

Elkins asserts that the defendants knew there was no legal or factual basis to stop her renovations, pointing to the decisive testimony of District officials in Superior Court that the permits were validly issued. But that testimony, credited as it was by the court, tells only part of the story. OAH later found that the officials who tried to stop the renovation did so with a good faith belief that the construction exceeded the scope of the permits and was inconsistent with the historic character of the neighborhood. Pls.' Mot. for Partial Summ. J. Ex. 20 (OAH Final Ruling), at 21 n.13. The fact that the initial permits were valid does not mean that later interventions based on well-founded doubts about the scope

of the actual construction are gravely unfair. Moreover, Elkins does not dispute that she violated one of the permits, a concession that flatly contradicts her argument that any effort to stop the construction was gravely unfair. *Id.* at 46. And although OAH found that District officials "dueled amongst themselves" and "sent out mixed messages," *id.* at 44, this at most shows "agency confusion," not the "grave unfairness" required for a substantive due process claim.

Elkins also cannot use the search of her home or the seizure of documents as grounds for a claim under the Fifth Amendment, but for a different reason. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The remedy for any harm to Elkins from the search of her home is governed by the Fourth Amendment, to which we now turn.

III

Elkins maintains that the failure of the warrant to identify items to be seized made not only the seizure of her notebook unlawful, but also rendered the entire warrant, and thus the search itself, invalid. When Elkins first raised this argument below, the district court held that she could not challenge the legality of the search because OAH had already ruled it lawful. *Elkins I*, 527 F. Supp. 2d at 46. To Elkins's subsequent assertion that a "manifestly erroneous" ruling is not entitled to preclusive effect, the district court replied that, far from being "manifestly erroneous," the OAH decision was

correct. *Elkins IV*, 685 F. Supp. 2d at 4-5. We agree and thus need not consider whether collateral estoppel should apply.

The Fourth Amendment provides, in relevant part: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Not only must warrants be based on probable cause, but "the scope of the authorized search [must be] set out with particularity." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) ("[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional."). Elkins argues that the warrant used to search her home was void for lack of particularity because it failed to identify any items to be seized.

For this argument she relies entirely on *Groh v. Ramirez*, 540 U.S. 551 (2004). There the Supreme Court ruled a search to seize firearms unlawful because the warrant described the defendant's home as the only "person or property" to be seized and made no reference whatsoever to the firearms. *Id.* at 554. The Court held that the warrant failed the particularity requirement because it "provided no description of the type of evidence sought." *Id.* at 557. Because the warrant "did not describe the items to be seized *at all*," the Court concluded it "was so obviously deficient that we must regard the search as 'warrantless.'" *Id.* at 558. Elkins seizes upon this statement, stressing that the warrant in this case also did not describe items to be seized "*at all*."

But *Groh* cannot mean that every search warrant that fails to describe items to be seized is invalid. The requirements for a warrant vary based on the purpose for which it is sought,

*Michigan v. Clifford*, 464 U.S. 287, 294-95 (1984) (plurality opinion), and the purpose of the search determines the requisite level of particularity, *cf. Groh*, 540 U.S. at 557 (finding the warrant invalid because it "provided no description of the type of evidence sought"). Not all searches have seizures in mind. For example, the law has long accepted the use of search warrants to conduct "a routine inspection of the physical condition of private property" in order to ensure compliance with building codes, rather than to seize items. *See Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 530 (1967). It would make no sense to require a warrant to list items to be seized when the sole purpose of the search is to conduct an inspection, without seizing anything.

The Court followed these principles in *Groh*, holding the search to seize firearms unlawful because the warrant said nothing about them. *See Groh*, 540 U.S. at 563 (explaining that the defendant could be held liable for the search because he "did not have in his possession a warrant particularly describing the things *he intended to seize*" (emphasis added)). Here, the District officials sought only to gain entry to Elkins's home to see whether unlicensed construction work was being performed. The warrant listed her address and explained that the search was for "unlicensed construction work which is in violation of the Construction Codes." Defs.' Mot. to Dismiss Ex. 10. There is no indication that the officials envisioned seizing any documents when they sought the warrant. Instead, as explained in more detail below, the record shows the seizure of documents was a spur-of-the-moment response to the instructions of an MPD officer made during the search. *See, e.g.*, Elkins Decl. ¶ 24; Noble Dep. 39:7-41:9, 101:15-104:16, June 10, 2008. Given this context, the warrant's language was sufficiently particular. An administrative search warrant need not describe things to be seized when none are meant to be seized. Of course, any

seizures made during the search that do not fall within an exception to the warrant requirement are unconstitutional. But such missteps do not render the entire search illegal.

## IV

We agree with Elkins that the seizure of her notebook was unlawful. The warrant requirements of the Fourth Amendment are not mere formalities, but serve the "high function" of shielding citizens' private lives from all but necessary and fully justified governmental intrusion. *McDonald v. United States*, 335 U.S. 451, 455 (1948). And their protective power is at its apex when government officials contemplate a search within an individual's home: the right to be free from unreasonable governmental invasion at home is at the Amendment's "very core." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Within this highly protective framework, the particularity requirement serves an especially vital role. "[H]istory shows that the police acting on their own cannot be trusted," *McDonald*, 335 U.S. at 456, and the backdrop of the particularity requirement's adoption, the general search warrant, is powerful reminder of this truth. As James Otis declared, such warrants were "the worst instrument[s] of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever [were] found in an English law book." *Boyd v. United States*, 116 U.S. 616, 625 (1886) (citation and internal quotation marks omitted). In response, the Fourth Amendment demands that the government articulate a sufficient need not only for *a* search, but for the specific search to be executed, describing the particular place at issue and leaving "nothing . . . to the discretion of the officer executing the warrant" when it comes to what may be seized, *Marron v. United States*, 275 U.S. 192, 195 (1927). The seizure of Elkins's notebook violated this fundamental

guarantee. The particularity requirement "prevents the seizure of one thing under a warrant describing another," *id.*, much more the seizure of anything when the warrant describes nothing at all. The District cannot rely on a warrant authorizing visual inspection of a place to justify seizing documents in that place.

What remains is to determine whether the District or any of the individual defendants can be held liable for the seizure under 42 U.S.C. § 1983, which provides a remedy in damages to those deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under color of state law or the law of the District of Columbia. Only those who cause a violation of a right secured by the Constitution are liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Case law has established that a municipality can be held liable only for constitutional violations committed by an employee who acted according to a city "policy or custom" that was "the moving force" behind the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). And for the District officials, Elkins must produce evidence "that each [one], through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also id.* ("[V]icarious liability is inapplicable to . . . § 1983 suits . . . ."); *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) ("[T]here can be no *respondeat superior* liability under Section 1983.").

A. The District

Elkins's claim against the District fails because she did not plead in the district court the theory on which she now attempts to hold the District liable. Elkins alleged in her complaint that it was District policy "to invade the privacy and security of its residents without probable cause in order to

defeat their due process rights in building permit disputes." Compl. ¶ 11. The District challenged this allegation in its motion for summary judgment, and Elkins failed to respond. Rather, she shifted the ground of her argument, contending for the first time that the District should be held liable instead for failing to train and supervise employees in conducting searches. *See* Pls.' Opp'n to Defs.' Mot. for Summ. J. 21. The district court construed this new argument as a motion for leave to amend the complaint, which it denied. Coming nearly five years after the initial complaint and after discovery had closed, "it [was] simply much too late to amend." *Elkins II*, 610 F. Supp. 2d at 59.

We review denial of leave to amend a complaint for abuse of discretion, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996), and find none here. Undue delay is a valid reason to reject a party's attempt to add a new theory of liability to a complaint. *Foman v. Davis*, 371 U.S. 178, 182 (1962). On appeal, Elkins presses forward with her argument that there was a lack of training and supervision and completely disregards the district court's finding that she waited too long to advance this claim. The issue before us is the denial of the leave to amend and not the merits of Elkins's new theory. Elkins makes no attempt to argue that the finding of undue delay was made in error, and we see no reason to think it was.

B. Maloney

The district court granted summary judgment to David Maloney, finding that although he was a driving force in the efforts to halt the renovations, he was not involved in the decision to seize documents. *Elkins III*, 636 F. Supp. 2d at 33-34. We agree. Elkins points to no evidence suggesting that Maloney caused the seizure. Maloney works for HPO, which

was not responsible for the warrant and search; DCRA was. Elkins claims Maloney directed Williams-Cherry to participate in the search, but the evidence she identifies shows only that Williams-Cherry told him that she would be involved. That same evidence actually establishes that DCRA, not HPO, directed her to participate in the search. Williams-Cherry Dep. 79:2-80:16, Mar. 19, 2008. And Williams-Cherry was clear in her testimony that Maloney had "nothing to do with [the] search." *Id.* at 80:7-8. Elkins argues that Maloney could have seen that the warrant was inadequate on its face. But there is no evidence that Maloney ever saw the warrant, and even if he had, the warrant was not facially invalid. As we have already discussed, there is nothing in the warrant even suggesting that anything would be seized during the search.

Elkins also argues that Maloney should be held liable because he failed to properly train and supervise Williams-Cherry. The district court concluded that "mere allegation of a supervisory role" was insufficient to establish liability, and in any event the evidence could not show that his conduct was sufficiently deficient to establish supervisory liability. *Elkins III*, 636 F. Supp. 2d at 34. Supervisory liability is limited under § 1983. The plaintiff must show that "a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances." *Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987). Even if Maloney did have a responsibility to train and supervise Williams-Cherry, which he disputes, summary judgment in his favor was still appropriate because the record shows, at best, "mere negligence," not an "affirmative link" between Maloney's conduct and the constitutional injury. *Id.* at 1260. This link must be strong enough that, from Maloney's perspective, the possibility of a constitutional violation occurring due to poor training or supervision would have been highly likely, not simply foreseeable. *Id.* at 1261. Supervisory liability under

§ 1983 is triggered only when a supervisor fails to provide more stringent training in the wake of a history of past transgressions by the agency or provides training "so clearly deficient that some deprivation of rights will *inevitably* result absent additional instruction." *Int'l Action Ctr.*, 365 F.3d at 27 (quoting *Haynesworth*, 820 F.2d at 1261-62) (internal quotation mark omitted). There was no pattern of constitutional violations to put Maloney on notice that training was required; indeed, this was the first search warrant DCRA had ever sought. And even if it was *foreseeable* that an untrained official might take a false step in these new and unfamiliar circumstances, such a result was by no means *inevitable*, especially as the search was led by officers from the MPD, who are trained in the proper execution of a warrant.

### C. Love

J. Gregory Love was the Administrator of the DCRA Building and Land Regulation Administration until his retirement in November 2002. The district court denied Elkins's motion for summary judgment against Love, finding there were factual disputes about his connection to the seizure of the notebook. But when Elkins agreed not to proceed to trial, the district court dismissed her claim against Love: Elkins had presented enough evidence to get to a jury, but not enough for judgment in her favor as a matter of law. *Elkins V*, 710 F. Supp. 2d at 62. On appeal, Elkins argues that the district court erred in denying her motion for summary judgment against Love, relying entirely, as did the district court, on two pieces of evidence: Love's May 2002 instruction to Vincent Ford, DCRA's chief building inspector, to "find a way" to stop the work at Elkins's home, and an October 2002 email the District's counsel sent to Love and others asking about next steps for enforcement actions against

Elkins. *See id*. Neither connects Love to a decision to seize documents or even to seek a search warrant, and there is no other evidence to contradict Love's testimony that he was not involved in either of those decisions. *See Haynes v. Williams*, 392 F.3d 478 (D.C. Cir. 2004) ("The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment."). Indeed, Love retired four months before the warrant was even sought. If the court erred it was by failing to grant summary judgment *to* Love. There was no error in denying summary judgment *against* him and, instead, dismissing him from the case.

## D. Noble

Denzil Noble succeeded Love and was Acting Administrator at the time of the search. The district court granted Elkins summary judgment against Noble, relying on three pieces of evidence. *Elkins V*, 710 F.2d at 64. None, however, shows he caused the seizure of documents. The district court first noted that Noble signed the application for the search warrant, *id.*, but that alone cannot implicate him in a seizure neither sought in the application nor authorized in the warrant. Next, the court emphasized that a draft of an affidavit supporting the application did ask for authority to seize documents. *Id.* But there is no evidence Noble ever saw the draft, and, of course, it was only a draft. The version of the affidavit filed in support of the warrant said nothing about a seizure. Finally, the court relied on a single statement by Noble in his deposition that seizing documents was a purpose of the search. *Id.* But the deposition transcript shows that Noble immediately corrected himself on this point. Noble Dep. 62:6-64:19. He testified repeatedly throughout the deposition that he thought the warrant would be used only to conduct a visual inspection, not to seize documents, and that he was "surprised" to learn later that documents had been

taken. *Id.* at 39:7-41:9, 101:15-104:16. Consistent with that testimony, there is simply no evidence that Noble ever spoke with anyone on the search team about the search. *Id.* at 41:1-9, 105:9-11.

Elkins argues that Noble's efforts to stop the renovations make him somehow liable for the seizure. But the stop work orders and the requests to inspect the construction at her home have no bearing on whether Noble caused documents to be improperly seized. There is no evidence that Noble said or did anything over the course of these events that caused members of the search team to take documents, rather than conduct a visual search alone. Not only was Elkins not entitled to summary judgment against Noble, but we conclude that no reasonable juror could conclude that any act by Noble caused the unlawful seizure. We reverse the district court's determination and order that summary judgment be entered in Noble's favor.

E. Williams-Cherry

There is no question that Williams-Cherry's "own individual actions," *Iqbal*, 556 U.S. at 676, were instrumental to the seizure: She took the notebook from Elkins. Williams-Cherry argues that she is nonetheless entitled to summary judgment on the grounds of qualified immunity. Elkins responds that this argument is waived because Williams-Cherry failed to raise it before the district court. Appellants' Reply Br. 32; *see also District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal."). But the defendants raised a qualified immunity defense in three separate motions, Defs.' Mot. to Dismiss 37-40, ECF No. 7; Defs.' Updated Mot. for Summ. J. 30-33, ECF No. 43; Defs.'

Opp'n to Pls.' Mot. for Recons. 8-9, ECF No. 105, and the district court ruled on the issue in its first opinion in the case, *Elkins I*, 527 F. Supp. 2d at 51 ("Qualified immunity does not shield the individual Defendants from liability on Plaintiffs' Fourth Amendment claim."). We must therefore consider the merits of Williams-Cherry's defense when reviewing the district court's grant of summary judgment against her.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under this standard, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also id.* at 206 (explaining that the doctrine ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful"). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Aschroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The district court denied Williams-Cherry qualified immunity on the ground that it has long been clearly established that seizing items based on a warrant that does not authorize such seizure is unconstitutional. In doing so, the district court misapplied the "clearly established" inquiry. That Elkins's rights were clearly violated does not mean Williams-Cherry clearly should have known she was violating them. The appropriate question for us to ask is whether it would have been clear to a reasonable official in Williams-Cherry's situation that seizing Elkins's notebook was unlawful.

Williams-Cherry was one of several people who carried out the search, including MDP officers and officials from DCRA and HPO. The MPD officers led the search along with DCRA employee Juan Scott, one of Williams-Cherry's supervisors,[3] who provided primary oversight of the agency officials. Williams-Cherry was never given a copy of the warrant. She was not shown the warrant. Scott had the warrant in hand when he and the other agency officials arrived first at the home. When MPD officers arrived, Scott gave the warrant to them. According to Elkins, no one searched for any documents until an MPD officer announced that they had the right to do so. Elkins Decl. ¶ 24; *see also* Elkins Dep. 37:14-38:18 (explaining that seizures began after an MPD officer gave "permission"). After the search began, Scott told Williams-Cherry, who was taking pictures of the outside of the house, to come inside and photograph its interior. Inside, Williams-Cherry saw officials searching through drawers. She asked Scott if that was allowed. Scott conferred with an MPD officer within earshot of Williams-Cherry, and the officer said again that anything related to construction, including documents, could be seized. When Elkins produced the notebook Williams-Cherry, who was standing nearby, took it from her.

We do not think it would be clear to "a reasonable officer . . . in the situation [Williams-Cherry] confronted" that taking the notebook from Elkins was a violation of the Fourth Amendment. *Saucier*, 533 U.S. at 202. Williams-Cherry was but a junior member of the search team present to take pictures in an inspection led by police and her superiors.

---

[3] Although Williams-Cherry is an HPO inspector, she was also a contract worker for DCRA at the time of the search. *Elkins I*, 527 F. Supp. 2d at 41. As the search was DCRA's operation, not HPO's, Scott was her supervisor for purposes of the search.

Before taking the notebook from Elkins, Williams-Cherry asked her superiors about the permissible scope of the search and relied upon the judgment of her supervisor and the police officer in charge. We do not find any one of these factors dispositive, but viewing them together, we conclude that Williams-Cherry's actions, though mistaken, were not unreasonable. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law.").

Several other circuits have addressed the reasonableness of an inferior officer's reliance upon the conclusions of a superior and reached similar outcomes. In the underlying *Groh* case, the Ninth Circuit addressed an almost identical situation and held that "[w]hat's reasonable for a particular officer depends on his role in the search." *Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1027 (9th Cir. 2002), *aff'd sub nom.*, *Groh v. Ramirez*, 540 U.S. 551 (2004). The court explained that although those who lead the team must read the warrant and assure themselves of its sufficiency,

> Line officers, on the other hand, are required to do much less. They do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid. So long as they make inquiry as to the nature and scope of the warrant, their reliance on leaders' representations about it is reasonable. . . . Because they were not required to read the warrant, the line officers conducting this search cannot reasonably have been expected to know that it was defective.

*Id.* at 1028 (citations, alterations, and internal quotation marks omitted). The First Circuit has similarly held that an official

"may reasonably rely on a fellow officer or agent who does (or by position should) know the substantive law and the facts and who (based on that knowledge) asserts" that some action is lawful. *Liu v. Phillips*, 234 F.3d 55, 57 (1st Cir. 2000); *see also id.* at 58 ("In the few pertinent cases we could find, officers who reasonably relied on superior officers have been held to be entitled to qualified immunity even if the officer who gave the direction acted on a misapprehension as to the law."); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998) ("[A] police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer' may nonetheless be entitled to qualified immunity as long as the officer's reliance was 'objectively reasonable.'" (quoting *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997))); *cf. KRL v. Estate of Moore*, 512 F.3d 1184, 1192-93 (9th Cir. 2008) (distinguishing *Ramirez* on the ground that the line officers there, like Williams-Cherry here, did not play a key role in the overall investigation). Whether an official's reliance is reasonable will always turn on several factors, but there is no basis in this record to find that Williams-Cherry's was not. She is entitled to summary judgment based on qualified immunity.

V

For the foregoing reasons, the district court's orders are affirmed in all respects except that the entries of summary judgment against Noble and Williams-Cherry are vacated and the case remanded with instructions to enter judgment in their favor.

*So ordered.*