# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 27, 2014        Decided September 2, 2014

No. 12-7127

THEODORE WESBY, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

EDWIN ESPINOSA, OFFICER - METROPOLITAN POLICE
DEPARTMENT, IN BOTH HIS OFFICIAL AND INDIVIDUAL
CAPACITIES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00501)

———

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With him on the briefs were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, at the time the briefs were filed. *Loren L. AliKhan*, Deputy Solicitor General, entered an appearance.

*Gregory L. Lattimer* argued the cause and filed the brief for appellees.

Before: BROWN and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Circuit Judge* BROWN.

PILLARD, *Circuit Judge*: A group of late-night partygoers responded to a friend's invitation to gather at a home in the District of Columbia. The host had told some friends she was moving into a new place and they should come by for a party. Some of them informally extended the invitation to their own friends, resulting in a group of twenty-one people convening at the house. With the festivities well underway, Metropolitan Police Department ("MPD") officers responded to a neighbor's complaint of illegal activity. When the police arrived, the host was not there. The officers reached her by phone, and then called the person she identified as the property owner, only to discover that the putative host had not finalized any rental agreement and so lacked the right to authorize the soiree. The officers arrested everyone present for unlawful entry. But because it was undisputed that the arresting officers knew the Plaintiffs had been invited to the house by a woman that they reasonably believed to be its lawful occupant, the officers lacked probable cause for the arrest. Nor was there probable cause to arrest for disorderly conduct because the evidence failed to show any disturbance of sufficient magnitude to violate local law. We accordingly affirm the district court's grant of summary judgment to Plaintiffs on the ground that the arrests violated their clearly established Fourth Amendment rights and District of Columbia law against false arrest. Because the supervising

police sergeant at the scene also overstepped clear law in directing the arrests, the district court also correctly held the District of Columbia liable for negligent supervision.

**I.**

The District of Columbia and two police officers in their individual capacities appeal the district court's liability determinations resulting from the grant of partial summary judgment against them. The court granted partial summary judgment in Plaintiffs' favor because, given the uncontroverted evidence of record regarding the information known to the sergeant and two of the officers at the time of the arrests, no reasonable officer in their shoes could have found probable cause to arrest any of the Plaintiffs. The court's grant of summary judgment was only partial, however, in several ways: First, the court denied Plaintiffs' motion for summary judgment against several other officers in the face of factual disputes about what they knew at the scene; the Plaintiffs then abandoned those claims and the court dismissed them with prejudice. Second, the court granted the Defendants' cross-motion for summary judgment on claims against all of the officers in their official capacities, dismissing those claims, too, with prejudice. Finally, the Plaintiffs' summary judgment motion was limited to liability, leaving remedial determinations to the jury. At a trial on damages, the jury awarded each Plaintiff between $35,000 and $50,000 in compensatory damages. The only questions on this appeal address the validity of the partial summary judgment liability holding.

For purposes of appeal of a grant of a plaintiff's motion for summary judgment, we view the facts in the light most favorable to defendants. In the early morning hours of March 16, 2008, the MPD dispatched officers to investigate a

complaint of illegal activities taking place at a house in Washington, D.C. The officers heard loud music as they approached the house and, upon entering, saw people acting in a way they viewed as consistent "with activity being conducted in strip clubs for profit"—several scantily clad women with money tucked into garter belts, in addition to "spectators . . . drinking alcoholic beverages and holding [U.S.] currency in their hands." Some of the guests scattered into other rooms when the police arrived. The parties dispute how fully the house was "furnished," but the police observed at least some folding chairs, a mattress, and working electricity and plumbing.[1]

One of the Defendants-Appellants, Officer Anthony Campanale, took photographs of the scene and, along with other officers, interviewed everyone present to find out what they were doing at the house. The partygoers gave conflicting responses, with some saying they were there for a birthday party and others that the occasion was a bachelor party. Someone told Officer Campanale that a woman referred to as "Peaches" had given them permission to be in the house; others said that they had been invited to the party by another guest. Peaches was not at the house. Nobody who was present claimed to live there or could identify who owned the house.

Another Defendant-Appellant, Officer Andre Parker, spoke to a woman who told him that Peaches "was renting the house from the grandson of the owner who had recently

---

[1] The record also contains inconsistencies regarding what, if any, contraband the police found. For example, the arrest report says that Officer Parker recovered marijuana inside the house, but he acknowledged in his deposition that he smelled—but did not find—marijuana. Moreover, nothing in the record indicates that any of the officers observed any drug-related activity.

passed away and that [the grandson] had given permission for all individuals to be in the house." The woman then used her cell phone to call Peaches. Officer Parker spoke to Peaches, who refused to return to the house because she said she would be arrested if she did. When Officer Parker asked who gave her permission to be at the house, Peaches told Officer Parker that he could "confirm it with the grandson." Officer Parker then used the same phone to call the apparent owner, identified in the record only as Mr. Hughes, who told Officer Parker that he was trying to work out a lease arrangement with Peaches but had yet to do so.[2] Hughes also told Officer Parker that the people in the house did not have his permission to be there that evening.

Sergeant Andre Suber, an MPD supervisor who was acting as the watch commander that night, arrived on the scene after the officers had begun their investigation. The officers briefed Sergeant Suber, including telling him about Parker's conversations with Peaches and Hughes. Sergeant Suber also spoke to Peaches directly by phone. According to Sergeant Suber, Peaches told him that "she was possibly renting the house from the owner who was fixing the house up for her" and that she "gave the people who were inside the place, told them they could have the bachelor party." As the police continued to talk to Peaches, she acknowledged that she did not have permission to use the house. On that basis—and notwithstanding the undisputed statements of both the guests and Peaches that she had given them permission to be at the house—Sergeant Suber ordered the officers to arrest everyone for unlawful entry.

---

[2] The record does not make clear how Officer Parker obtained Hughes's contact information or whether, at the time of the arrests, the police had made any independent efforts to verify that Hughes was in fact the owner of the house.

After the police arrested and transported the partygoers to the police station, Sergeant Suber and the lieutenant taking over as watch commander discussed the appropriate charges for the Plaintiffs. According to Sergeant Suber, the lieutenant decided to change the charge to disorderly conduct after speaking with a representative from the District of Columbia Attorney General's office. Sergeant Suber disagreed, but the lieutenant overruled him. The officers who had been at the house, including Sergeant Suber, each testified that they had neither seen nor heard anything to justify a disorderly conduct charge.

Sixteen of the arrestees sued five officers for false arrest under 42 U.S.C. § 1983, the officers and the District for false arrest under common law, and the District for negligent supervision. On cross-motions for partial summary judgment as to liability, the district court granted the parties' motions in part and denied both motions on some issues. The court ruled in favor of the Plaintiffs on their claims of false arrest against Officers Parker and Campanale in their individual capacities, and on the common law false arrest and negligent supervision claims against the District. Defendants appeal these liability determinations.

**II.**

We review de novo a district court's summary judgment ruling, "apply[ing] the same standard of review applicable to the underlying claims in the district court." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008). A party is entitled to summary judgment where, "viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor," *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 4 (D.C. Cir. 2011), this Court determines that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We begin with Plaintiffs' entitlement to summary judgment on their Section 1983 and common-law false arrest claims. Because "[t]he elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim," we address the merits of those claims together. *See Scott v. District of Columbia*, 101 F.3d 748, 753-54 (D.C. Cir. 1996) (citing *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977)). As with most false-arrest claims, Plaintiffs' claims "turn on the issue of whether the arresting officer[s] had probable cause to believe that [Plaintiffs] committed a crime." *Id.* at 754. Defendants argue that the district court erred in finding the arrests unsupported by probable cause because, in their view, the officers had objectively valid bases to arrest the Plaintiffs both for unlawful entry and disorderly conduct. In the alternative, Defendants contend that, even if probable cause were lacking, the officers are shielded from liability by qualified immunity and a common-law privilege. We address these contentions in turn.

**A.**

The assessment of probable cause is an objective one. An arrest is supported by probable cause if, "at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the suspect has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Based on the undisputed facts relevant to the knowledge the police had at the time of the arrests, and "giv[ing] due

weight to inferences drawn" by the officers, we consider de novo whether those facts support a determination of probable cause to arrest. *Ornelas v. United States*, 517 U.S. 690, 697, 699 (1996). Defendants contend that they were justified in arresting Plaintiffs for unlawful entry and disorderly conduct. To determine whether they had probable cause to believe that Plaintiffs were violating District of Columbia law, we look to District law to identify the elements of each of those offenses. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Upon examination of the relevant statutes and case law, we conclude that no reasonable officer could have concluded that there was probable cause to arrest Plaintiffs for either crime.

*Unlawful Entry.* At the time of Plaintiffs' arrests, District of Columbia law made it a misdemeanor for a person to, "without lawful authority, . . . enter, or attempt to enter, any public or private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof." D.C. Code § 22-3302 (2008).[3] To sustain a conviction for unlawful entry, the government must prove that "(1) the accused entered or attempted to enter public or private premises or property; (2) he did so without lawful authority; (3) he did so against the express will of the lawful occupant or owner; and (4) general intent to enter." *Culp v. United States*, 486 A.2d 1174, 1176 (D.C. 1985).

The probable-cause inquiry in this case centers on the third and fourth elements, which together identify the culpable mental state for unlawful entry. *See Ortberg v. United States*, 81 A.3d 303, 305 (D.C. 2013). Specifically,

---

[3] Both the unlawful-entry statute (D.C. Code § 22-3302) and the disorderly-conduct statute (D.C. Code § 22-1321) have been amended since the events at issue here. Throughout this opinion, we refer to the versions of the statutes in effect during the relevant time period.

the question is whether a reasonable officer with the information that the officers had at the time of the arrests could have concluded that Plaintiffs knew or should have known they had entered the house "against the will of the lawful occupant or of the person lawfully in charge thereof," and intended to act in the face of that knowledge. D.C. Code § 22-3302; *see Ortberg*, 81 A.3d at 305; *Artisst v. United States*, 554 A.2d 327, 330 (D.C. 1989).

Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). But the police cannot establish probable cause without at least *some* evidence supporting the elements of a particular offense, including the requisite mental state. *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999). Because the offense of parading without a permit, for example, requires knowledge that no permit issued, "officers who make such an arrest must have reasonable grounds to believe" that the suspects knew no permit had been granted. *Carr v. District of Columbia*, 587 F.3d 401, 410-11 (D.C. Cir. 2009).

In this case, the officers on the scene had three pieces of information that could bear on whether the Plaintiffs knew or should have known that they had entered a house against the owner's express will. First, the officers had Plaintiffs' statements that they had been invited to some kind of party at the house, with inconsistent and conflicting statements about the type of party. Second, the officers had explicit, uncontroverted statements from Peaches and a guest at the scene that Peaches had told the people inside the house that they could be there. Finally, the officers had a statement by the claimed owner of the house that he had been trying

unsuccessfully to arrange a lease with Peaches and that he had not given the people in the house permission to be there.

As a preliminary matter, Defendants argue that Peaches' invitation is irrelevant to the determination of probable cause, because whether the Plaintiffs had a bona fide belief in their right to enter the house "simply raises a defense for the criminal trial." That argument misses the mark. The District of Columbia Court of Appeals recently reiterated that "the existence of a reasonable, good faith belief [in permission to enter] is a valid defense *precisely because it precludes the government from proving what it must*—that a defendant knew or should have known that his entry was against the will of the lawful occupant." *Ortberg*, 81 A.3d at 309 (emphasis added).

It is true that, if prosecuted for unlawful entry, a defendant may raise as a defense that he entered the building "with a good purpose and with a bona fide belief of his right to enter." *Smith v. United States*, 281 A.2d 438, 439 (D.C. 1971); *see United States v. Thomas*, 444 F.2d 919, 926 (D.C. Cir. 1971); *Ortberg*, 81 A.3d at 308-09. But the cases interpreting the unlawful-entry statute are clear and consistent that such a defense is available precisely because a person with a good purpose and bona fide belief of her right to enter "lacks the element of criminal intent required" by the statute. *Smith*, 281 A.2d at 439; *see also McGloin v. United States*, 232 A.2d 90, 91 (D.C. 1967) (dismissing concern about unintentional violations of the statute, because "one who enters for a good purpose and with a bona fide belief of his right to enter is not guilty of unlawful entry"); *Bowman*, 212 A.2d 610, 611-12 (D.C. 1965) ("[O]ne who enters . . . for a good purpose and with bona fide belief of his right to enter . . . would not be guilty of an unlawful entry . . . .").

Thus, contrary to Defendants' argument, Peaches' invitation is central to our consideration of whether a reasonable officer could have believed that the Plaintiffs had entered the house unlawfully. That is because, in the absence of any conflicting information, Peaches' invitation vitiates the necessary element of Plaintiffs' intent to enter against the will of the lawful owner. A reasonably prudent officer aware that the Plaintiffs gathered pursuant to an invitation from someone with apparent (if illusory) authority could not conclude that they had entered unlawfully.

Ignoring the significance of Peaches' invitation, Defendants argue that Hughes's statement that he had not given the Plaintiffs permission to be in the house is dispositive because a homeowner's denial that he has given permission to enter his property is sufficient to establish probable cause to arrest for unlawful entry. We disagree. Importantly, Hughes never said *that he or anyone else had told the Plaintiffs* that they were not welcome in the house. Peaches eventually admitted that *she* did not have permission to be in the house or to invite others, but there is no evidence that she had told the Plaintiffs as much. Indeed, the evidence is uniform that the arrestees all were invited, and there is simply no evidence in the record that they had any reason to think the invitation was invalid. All of the information that the police had gathered by the time of the arrest made clear that Plaintiffs had every reason to think that they had entered the house with the express consent of someone they believed to be the lawful occupant.[4] Accordingly, there was no

---

[4] For this reason, Defendants' contention that arresting officers are not required to "sift through conflicting evidence or resolve issues of credibility" is beside the point. Multiple officers on the scene testified that they did not observe anything leading them to believe that the Plaintiffs had any reason to think they lacked the right to be in the house. There is also no evidence that the officers asked either Peaches or Hughes whether

probable cause for the officers to believe that the Plaintiffs entered the house knowing that they did so against the will of the owner or occupant.

The cases on which Defendants rely do not compel a different conclusion. Citing to *McGloin*, 232 A.2d 90, and *Culp*, 486 A.2d 1174, Defendants argue that Hughes's statement was sufficient because "[t]he offense of unlawful entry does not require any kind of prior warning in the case of a private dwelling." Br. for Appellants 22. *Culp* and *McGloin* establish that an owner of a private dwelling need not post any sign or warning in order to express an intent to exclude the general public. *See Culp*, 486 A.2d at 1177 (probable cause for unlawful entry where the building is vacant and "the property itself reveals indications of a continued claim of possession by the owner or manager"); *McGloin*, 232 A.2d at 91 ("[S]urely no one would contend that one may lawfully enter a private dwelling house simply because there is no sign or warning forbidding entry."). But those cases do not apply here, because the Plaintiffs did not simply find a house that appealed to them and walk in off the street; they entered the specified home at the invitation of someone they reasonably believed was an authorized inhabitant.

Defendants' reading of *Culp* and *McGloin* would provide probable cause to arrest for unlawful entry any individual in a

the *Plaintiffs* knew that Peaches had no right to be in the house. Had they asked such questions and gotten an affirmative answer, Defendants' argument would carry weight. *See Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005) (officers entitled to discredit Section 1983 plaintiff's innocent explanation for entry into a house in the face of conflicting evidence); *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002) (probable cause to make an arrest based on inculpatory statements by a reliable informant, notwithstanding exculpatory statements from the suspect that "tended to discredit [the informant's] version of events").

private dwelling without the express permission of the owner. Such a rule would transform the unlawful-entry statute from one barring entry "against the will of the owner" into one criminalizing entry "without the express invitation of the owner." A brunch host who overstays her lease does not thereby expose her invited guests to arrest for unlawful entry, nor does a person summoned onto property by a stranger who appears to be the lawful inhabitant commit the crime of unlawful entry if she reasonably fails to recognize that the stranger is not the owner at all, but a traveling salesman. What the unlawful-entry law requires is some showing that the individual entered a place that she knew or should have known she was not entitled to be.

The cases Defendants cite merely recognize that certain factual circumstances not present here make it reasonable to infer an interloper's intent to enter against the will of the owner. *McGloin*, for example, upheld an unlawful-entry conviction where the defendant entered an apartment building, ran up the fire escape and then onto the roof, and said first that he was looking for his cat and then "for a friend named DeWitt who lived in the building," when no one by that name lived there. 232 A.2d at 90. In his defense, McGloin relied on *Bowman*, where the court held that an entry into a semi-public space was not unlawful unless the owner had given an express "warning to keep off," which could be expressed verbally or "by sign." *See McGloin*, 232 A.2d at 91 (quoting *Bowman*, 212 A.2d at 611). Distinguishing *Bowman*, the court emphasized that McGloin entered "not a public or semi-public building," but an apartment building containing four private family dwellings. *Id.* Under such circumstances, it was "more than plain that wandering through the building, climbing on the roof or perching on the fire escape would be against the will of the owner." *Id.*

*Culp* addressed what inferences the police may reasonably draw when a person enters a property that appears to be vacant. In that case, the police saw three men, including the defendant, inside a "dilapidated" public housing property. *See Culp*, 486 A.2d at 1175. The men tried to leave through the back door when they saw the police approaching, and the defendant "could not explain his presence" when the officers asked what he was doing there. *Id.* Culp challenged his arrest for unlawful entry on the basis that the police lacked probable cause to believe that he knew he was entering the house against the will of the occupant. *See id.* The court found that the officers had probable cause to arrest Culp because "there were sufficient indications of efforts by [the housing authority] to protect the property against intruders that the officers could reasonably conclude that [Culp] knowingly entered against the will of the person lawfully in charge." *Id.* at 1177 (quotation marks and ellipsis omitted). The housing authority had made "continuous and diligent efforts to board up the house" and at least some of the windows remained boarded up when Culp entered. *Id.*

The arresting officers in this case, unlike those in *McGloin* and *Culp*, observed nothing inconsistent with the reason the Plaintiffs gave for being there—a reason that was corroborated, rather than undermined, by the information that Peaches gave to the officers: Peaches had invited them to her new apartment. Defendants point to the "highly suspicious and incriminating" activities the officers observed in the house to bolster the argument that the officers had no reason to credit the Plaintiffs' explanation for their presence. But the officers acknowledged that, other than the ostensible unlawful entry, they did not see anyone engaging in illegal conduct. Moreover, the activities they did observe—scantily clad women dancing, bills slipped into their garter belts, and

people drinking—were consistent with Plaintiffs' explanations that they were there for a bachelor or birthday party.[5] To the extent that people scattered or hid when the police entered the house, such behavior may be "suggestive" of wrongdoing, but is not sufficient standing alone to create probable cause. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that unprovoked flight "is not necessarily indicative of wrongdoing," but is suggestive enough that, given other circumstances, may justify further investigation). To the extent that the party involved semi-nude dancing or stripping, it is hardly surprising that participants would retreat as officers entered off the street.

As the district court explained, this is not a case in which "the property was boarded up, door latches were broken, no trespassing signs were posted or the manner of securing the property indicated that the owner wanted others to keep out." *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 33 (D.D.C. 2012). Notwithstanding the parties' dueling characterizations of how furnished and inhabited the house appeared, there is nothing in the record suggesting that the condition of the house, on its own, should have alerted the Plaintiffs that they were unwelcome. To the contrary, that the house had sparse furnishings and functioning utilities was entirely consistent with one individual's statement to Officer Parker that Peaches was the new tenant in a house previously occupied by the owner's recently deceased grandfather.

---

[5] In their brief, Defendants suggest that the evidence "showed that the suspects were using the house for unlawful activities, including drug use and prostitution" and cite to a variety of criminal statutes prohibiting that type of conduct. Br. for Appellants 30. Notably, however, Defendants do not attempt to justify Plaintiffs' arrests on any of those grounds, and entirely ignore that the officers uniformly testified that they did not see any evidence of drugs or similar illegal activity.

It bears emphasizing that Defendants are incorrect to suggest that our conclusion could render the unlawful-entry statute "unenforceable in most circumstances" or leave the police "powerless to make arrests for unlawful entry" in analogous situations. Br. for Appellants 24. The police were by no means powerless in this case. At a minimum, after speaking with Hughes and determining that he had not given Peaches permission to use the house, the officers could have told the Plaintiffs that they lacked permission to be there and so must leave. Had the officers "personally asked [the Plaintiffs] to leave and [the Plaintiffs] had refused," such a refusal would have supplied the probable cause the officers needed to make an arrest for unlawful entry. *District of Columbia v. Murphy*, 631 A.2d 34, 38 (D.C. 1993); *see id.* at 37 ("The offense of unlawful entry includes . . . cases where a person who has entered the premises with permission subsequently refuses to leave after being asked to do so by someone lawfully in charge.").

In sum, when faced with the facts and circumstances presented in this case—and, in particular, without any evidence that the Plaintiffs knew or should have known they were in the house against the will of the owner or lawful occupant—a reasonable officer could not have believed there was probable cause to arrest the Plaintiffs for unlawful entry.

***Disorderly Conduct.*** Defendants argue in the alternative that the officers had probable cause to arrest the Plaintiffs for disorderly conduct. At the time of the Plaintiffs' arrests, the relevant statute made it a crime to "shout[] or make[] a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons," either with the intent "to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby." D.C. Code § 22-1321(3) (2008).

The "breach of the peace" clause qualifies the remainder of the statute "and sets forth an essential element of the offense." *In re T.L.*, 996 A.2d 805, 810 (D.C. 2010).

Plaintiffs point to the evidence in the record that the arresting officers themselves did not believe there was evidence to support a disorderly conduct charge. As long as the arresting officers "had an objectively valid ground upon which" to make an arrest, however, the subjective knowledge and intent of the officers is irrelevant. *United States v. Bookhardt*, 277 F.3d 558, 566 (D.C. Cir. 2002); *see Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, even where police do not believe evidence suffices, or are unsure which of several offenses the suspect may have committed, an arrest is valid so long as, on the facts of which the officers were aware, an objective observer can discern probable cause. *See, e.g.*, *United States v. Broadie*, 452 F.3d 875, 881 (D.C. Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)); *Bookhardt*, 277 F.3d at 566; *United States v. Prandy-Binett*, 995 F.2d 1069, 1073-74 (D.C. Cir. 1993); *see also Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (Sotomayor, J.) ("[W]hen faced with a claim for false arrest, we focus on the validity of the arrest, and not on the validity of each charge."). Defendants are thus correct that the arresting officers' subjective belief that they lacked probable cause to arrest the Plaintiffs for disorderly conduct is not dispositive. What matters is whether, on the facts the officers knew at the time, a reasonably prudent officer could have found that the Plaintiffs were engaging in disorderly conduct. *See Whren*, 517 U.S. at 813; *Bookhardt*, 277 F.3d at 566.

The officers here, however, accurately estimated the evidence as inadequate to support probable cause to believe that the Plaintiffs' conduct was disorderly. As the district court recognized, some evidence suggested "the police were

told of reports of a loud party or loud music and some officers heard loud music upon arrival." *Wesby*, 841 F. Supp. 2d at 34. But Defendants exaggerate the nature and quantum of that evidence as showing that Plaintiffs had "disturbed the tranquility and nighttime slumber of the community residents." Br. for Appellants 32. The evidence on which Defendants rely shows nothing more than that one neighbor had called to complain about noise that evening.[6] A disorderly conduct violation under District of Columbia law requires that an arrestee disturbed a "considerable number of persons" and acted "under circumstances such that a breach of the peace may" have been occasioned by that arrestee's

---

[6] To the extent that the Defendants rely on Officer Campanale's trial testimony, that testimony was not before the district court at summary judgment and therefore is not part of the record on review of the grant of summary judgment. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009); *U.S. East Telecommc'ns, Inc. v. US West Commc'ns Servs., Inc.*, 38 F.3d 1289, 1301 (2d Cir. 1994). On the other hand, to the extent that Defendants refer to statements in the summary judgment record reflecting complaints from neighbors about the noise emanating from the house, such evidence is entitled to our consideration. Plaintiffs object to some of that evidence based on the prohibition against hearsay. *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks omitted)). But those statements would not be admitted for their truth (e.g., whether there was in fact loud music) but instead to show what information the officers had about the nature and scope of the disturbance at the time of the arrest. *See* Fed. R. Evid. 801(c); *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008) (considering, on summary judgment, evidence contested as hearsay on the basis that statements were not offered for the truth of the matter asserted); *see also Draper v. United States*, 358 U.S. 307, 311-12 (1959) (rejecting contention that officers may not consider hearsay in probable cause assessment). As our discussion makes clear, however, that evidence is relevant to the legal determination of probable cause. *See, e.g.*, *United States v. Branch*, 545 F.2d 177, 184-85 (D.C. Cir. 1976) (emphasizing that the probable cause determination in *Draper*, though based in part on hearsay evidence, was appropriate because that evidence "was explicitly detailed and corroborated by events as they transpired").

conduct. D.C. Code § 22-1321 (2008); *In re T.L.*, 996 A.2d at 808-09 (concluding that defendant did not create "breach of the peace" within the meaning of the statute despite the fact that "some ten to fifteen people left their town houses" in order to observe the "clamor" that defendant caused by yelling loudly on the street). Even viewing it, as we must, in the light most favorable to the Defendants, the evidence here simply does not rise to that level.[7]

For all of these reasons, we conclude that the officers lacked probable cause to arrest the Plaintiffs for unlawful entry or disorderly conduct.

**B.**

Having concluded that Plaintiffs' arrests were unsupported by probable cause, we must consider whether qualified immunity shields the officers from liability. "An officer is entitled to qualified immunity, despite having engaged in constitutionally deficient conduct, if, in doing so, she did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If Officers Parker and Campanale had "an objectively reasonable basis for believing that the facts and circumstances surrounding [Plaintiffs'] arrest were sufficient to establish probable cause," *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993) (citing *Malley v. Briggs*, 475 U.S. 335, 341

---

[7] Our conclusion that there was insufficient evidence for a reasonable officer to conclude that the noise from the house had disturbed a considerable number of people necessarily forecloses Defendants' argument that "there was probable cause to believe the plaintiffs, as a group, had engaged in disorderly conduct." *See* Br. for Appellants 33 (citing *Carr*, 587 F.3d at 407).

(1986)), they would be immune from Plaintiffs' suit for damages.

As with all cases examining whether a particular right was sufficiently clear, "[w]e begin by establishing the appropriate level of generality at which to analyze the right at issue." *Johnson v. District of Columbia*, 528 F.3d 969, 975 (D.C. Cir. 2008); *see, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999); *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). Here, the question is whether, in light of clearly established law and the information that Officers Parker and Campanale had at the time, it was objectively reasonable for them to conclude that there was probable cause to believe Plaintiffs were engaging in either unlawful entry or disorderly conduct. *See Wilson*, 526 U.S. at 615. This inquiry into the "objective legal reasonableness" of the officers' actions parallels but does not duplicate the reasonableness aspect of the Fourth Amendment probable cause analysis. *See Johnson*, 528 F.3d at 976 (describing the two *Saucier* steps as "distinct but overlapping").

To determine whether the officers "strayed beyond clearly established bounds of lawfulness," *id.*, we look first to "cases of controlling authority," *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (quoting *Wilson*, 526 U.S. at 617). It is not enough to reiterate that the Fourth Amendment's restrictions against arrest without probable cause are clearly established; the inquiry must be made more contextually, at a finer level of specificity. At the same time, "[w]e need not identify cases with materially similar facts, but have only to show that the state of the law at the time of the incident gave the officer[s] fair warning" that their particular conduct was unconstitutional. *Johnson*, 528 F.3d at 976 (brackets, ellipsis, and quotation marks omitted).

Turning first to the claim of false arrest for unlawful entry, we conclude that no reasonable officer could have believed there was probable cause to arrest Plaintiffs for entering unlawfully where, as here, there was uncontroverted evidence that Plaintiffs believed they had entered at the invitation of a lawful occupant. Defendants argue that, because no case identified by Plaintiffs had "invalidated an arrest for unlawful entry under similar circumstances," it was not clearly established that arresting Plaintiffs for unlawful entry was unconstitutional. But that is not the applicable standard. Qualified immunity need not be granted every time police act unlawfully in a way that courts have yet to specifically address. *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) ("To be established clearly, . . . there is no need that the very action in question have previously been held unlawful." (brackets and internal quotation marks omitted)); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

The law in this jurisdiction has been well established for decades that probable cause to arrest requires at least some evidence that the arrestee's conduct meets each of the necessary elements of the offense that the officers believe supports arrest, including any state-of-mind element. *See, e.g.*, *Carr*, 587 F.3d at 410-11; *Christian*, 187 F.3d at 667. Under District of Columbia law, criminal intent is a necessary element of the offense of unlawful entry. A person who has a good purpose and bona fide belief of her right to enter "lacks the element of criminal intent required" to violate the unlawful-entry statute. *Smith*, 281 A.2d at 439. Notwithstanding Defendants' suggestion to the contrary, *see* Oral Arg. Rec. at 5:40-5:52, District of Columbia unlawful-entry law predating the conduct in this case plainly required

that a suspect "knew or should have known that his entry was unwanted." *Ortberg*, 81 A.3d at 308 (collecting cases); *see also id.* at 307-08 (explaining that, although "lack[ing] some precision," prior discussions of "the mental states for entry and for doing so 'against the will' of the lawful occupant are both clearly discernible and distinct").

The controlling case law in this jurisdiction therefore made perfectly clear at the time of the events in this case that probable cause required some evidence that the Plaintiffs knew or should have known that they were entering against the will of the lawful owner. Defendants are simply incorrect to suggest that the officers could not have known that uncontroverted evidence of an invitation to enter the premises would vitiate probable cause for unlawful entry. *See Harlow*, 457 U.S. at 819 ("[A] reasonably competent public official should know the law governing his conduct.").

The same analysis holds true with respect to the clarity of the Fourth Amendment right against false arrest for disorderly conduct. Defendants contend that the law was not clearly established at the time of Plaintiffs' arrests because there was no case law interpreting the specific provision of the statute on which Defendants rely. They correctly point out that the first case from the District of Columbia Court of Appeals interpreting subsection (3) of D.C. Code § 22-1321 was decided after the arrests in this case. *See In re T.L.*, 996 A.2d at 810 ("This is the first prosecution under subsection (3) of the statute that has come to our attention."). But the plain text of that provision requires the disturbance of a "considerable number of persons." D.C. Code § 22-1321(3). Whatever a "considerable number of persons" means, surely it must mean something more than a single individual. And yet there is no evidence in this case that the loud music the officers heard when approaching the house disturbed anyone other than one neighbor who had complained.

Put differently, we believe that the language of the disorderly conduct statute, standing alone, was sufficient to give fair notice that there was no probable cause to make an arrest under these circumstances. We do not doubt, as the *In re T.L.* court acknowledged, that some parts of that provision may "pose their own interpretive issues." 996 A.2d at 810. That does not mean, however, that distinct elements of the offense were unclear in the absence of case law interpreting the statute. *See United States v. Lanier*, 520 U.S. 259, 266-67 (1997) (analogizing clearly established standard to fair warning principles in the context of criminal prosecutions, and noting that "the touchstone is whether the statute, *either standing alone or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal" (emphasis added)); *cf. Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (noting that "the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*").

Finally, we reject Defendants' arguments that Officers Parker and Campanale cannot be held liable under Section 1983 because (1) they followed Sergeant Suber's order to arrest the Plaintiffs, and (2) they were not each individually responsible for each of the Plaintiffs' arrests.

An officer is not necessarily entitled to qualified immunity simply because he relies on a supervisor's decision to arrest. In evaluating the objective legal reasonableness of an officer's position for purposes of qualified immunity, approval by a superior officer is "pertinent" but not "dispositive." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1249 (2012); *cf. Malley v. Briggs*, 475 U.S. 335, 345-46 (1986) (rejecting the notion that approval of a warrant by a neutral magistrate automatically establishes qualified

immunity, and requiring instead that the officer exercise his own "reasonable professional judgment"). Defendants argue to the contrary primarily in reliance on *Elkins v. District of Columbia*, 690 F.3d 554 (D.C. Cir. 2012), in which we held that an inspector from the Historic Preservation Office, a government agency "charged with protecting the city's historic structures," was entitled to qualified immunity for her unlawful seizure of the plaintiff's notebooks. *Id.* at 559, 567-68. *Elkins* held that, although the inspector had been personally involved in the unconstitutional seizure, it was reasonable for her not to know that her actions were unlawful. *See id.* at 568 ("The appropriate question for us to ask is whether it would have been clear to a reasonable official in [the inspector's] situation that seizing [the plaintiff's] notebook was unlawful."). Significantly, the inspector in that case was not a law enforcement officer at all, but "a junior member of the search team present to take pictures in an inspection led by police and her superiors." *Id.* Moreover, the *Elkins* court emphasized in granting qualified immunity that, although the inspector ultimately "relied upon the judgment of her supervisor and the police officer in charge," she did not blindly follow their orders. *Id.* Rather, she first "asked [them] about the permissible scope of the search." *Id.* Based on those and other factors, the court concluded that her actions, "though mistaken, were not unreasonable." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)).

The circumstances here, unlike in *Elkins*, do not show the officers' unquestioning reliance on Sergeant Suber's arrest order to be reasonable. *See id.* at 569 ("Whether an official's reliance [on her supervisor] is reasonable will always turn on several factors . . . ."). In contrast to the historic preservation investigator in *Elkins*, Officers Parker and Campanale are police officers with the independent authority to make arrests while on patrol. Indeed, had Sergeant Suber not come out to

the scene, they would have had to make the arrest determinations on their own. Police officers charged with enforcing the criminal statutes are expected to know the limitations on their authority, *see Harlow*, 457 U.S. at 819, and, as discussed above, a reasonably competent officer faced with the information the officers had gathered in this case should have known that he lacked probable cause to make an arrest.

This is also not a case, like *Elkins* and the decisions cited therein, in which the defendant officers played little or no role in the investigation. *See Elkins*, 690 F.3d at 569 (citing, by way of example, a case in which officers did not play a "key role in the overall investigation"). Here, Officers Parker and Campanale were actively involved in surveying the scene and gathering information regarding the Plaintiffs' knowledge and reason for being in the house, and Officer Parker spoke to both Peaches and Hughes by phone. Both officers, moreover, were aware of the key uncontroverted facts in this case: that Peaches had invited the Plaintiffs to the house, and that the Plaintiffs had no reason to doubt that Peaches had the right to extend such an invitation. Under these circumstances, it was not reasonable for the officers to rely on Sergeant Suber's unlawful decision to arrest the Plaintiffs. Yet another factor present in *Elkins* but missing in this case is that neither Officer Parker nor Officer Campanale raised the question—to Sergeant Suber or anyone else—whether there was evidence that the Plaintiffs knew or should have known that their presence in the house was unauthorized. Indeed, there is no evidence in the record suggesting that Officer Parker or Officer Campanale in fact disagreed with Sergeant Suber's determination that there was probable cause for an arrest but carried out the arrests because they were under orders to do so.

That the officers were apparently as confused or uninformed about the law as their supervisor does not make it reasonable for them to have arrested the Plaintiffs in reliance on his flawed assessment. *Cf. Malley*, 475 U.S. at 346 n.9 ("The officer . . . cannot excuse his own default by pointing to the greater incompetence of the magistrate."); *Messerschmidt*, 132 S. Ct. at 1252 (Kagan, J., concurring in part and dissenting in part) (2012) ("[W]hat we said in *Malley* about a magistrate's authorization applies still more strongly to the approval of other police officers . . . ."). This Court has never held that qualified immunity permits an officer to escape liability for his unconstitutional conduct simply by invoking the defense that he was "just following orders." *See generally Hobson v. Wilson*, 737 F.2d 1, 67 (D.C. Cir. 1984) (statement denying petition for rehearing) (per curiam) (rejecting with "no hesitation" the defendants' argument, raised for the first time in petition for rehearing, that the existence of an illegal policy excused low-level government officials from liability). Indeed, "[i]n its most extreme form, this argument amounts to the contention that obedience to higher authority should excuse disobedience to law, no matter how central the law is to the preservation of citizens' rights." *Id.* For good reason, this Court has never adopted such a rule.

That leaves us with the contention that Officers Parker and Campanale cannot be held liable because they did not personally arrest each of the Plaintiffs. But Defendants' argument misapprehends the applicable legal standard for causation in the Section 1983 context. As this court has recognized, the Plaintiffs were required to "produce evidence 'that each [officer], through [his] own individual actions, has violated the Constitution.'" *Elkins*, 690 F.3d at 564 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Here, the cause of the group arrest was the investigation and erroneous determination regarding probable cause. Both Officers Parker

and Campanale were the hub of that investigation: they gathered evidence, including photographs of the people in the house, and actively participated in questioning the Plaintiffs and other key witnesses such as Hughes and Peaches. *See id.* at 566-68 (assessing whether the evidence showed that the individual officers caused the unlawful seizure, and noting in one instance that the defendant's actions were "instrumental to the seizure"). In this context, that is sufficient to establish causation. *See, e.g.*, *KRL v. Estate of Moore*, 512 F.3d 1184, 1193 (9th Cir. 2008) (denying qualified immunity to an officer who relied on a facially invalid warrant in conducting a search because he played "an integral role in the overall investigation" that led to the issuance of the defective warrant); *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991) (recognizing general rule that mere presence is insufficient to create liability, but upholding denial of qualified immunity based on record evidence that the officer had been "the prime mover" in obtaining the search warrant and "participated in the search once inside the dwelling" (internal quotation marks omitted)); *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (officers who did not physically perform pat-down but who "remained armed on the premises throughout the entire search" could be held liable under Section 1983 as "participants rather than bystanders").

Because the common-law privilege Defendants invoke overlaps with but is harder to establish than qualified immunity, the Defendants' argument on that score "fails for essentially the same reasons already set forth." *District of Columbia v. Minor*, 740 A.2d 523, 531 (D.C. 1999) (noting that the standard for common-law privilege "resembles the section 1983 probable cause and qualified immunity standards . . . (with the added clear articulation of the requirement of good faith)"); *cf. Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (explaining that

although the officer "need not demonstrate probable cause in the constitutional sense" for privilege to attach, the officer must show "(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable" (brackets and internal quotation marks omitted)). Accordingly, we affirm the district court's judgment insofar as it relates to Plaintiffs' Section 1983 and common-law false arrest claims.

## III.

Finally, we address the District's claim that the district court erred in granting summary judgment to the Plaintiffs on their common-law negligent supervision claim. The District makes two arguments in support of its contention that the district court erred. First, the District contends that the negligent supervision claim must fail because the arrests were supported by probable cause, so either the standard of care was met or there was no underlying tort. That argument, however, is foreclosed by our conclusion that the officers lacked probable cause to arrest the Plaintiffs.

Second, the District argues that it was entitled to summary judgment on this claim because the Plaintiffs failed to present expert testimony regarding the standard of care. We disagree. District of Columbia law requires expert testimony only where "the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). Moreover, although the District correctly points out that courts often require expert testimony where the training and supervision of police officers is concerned, *see* Br. for Appellants 43 (citing cases), the fact that the supervising

official was on the scene and directed the officers to make the unlawful arrests distinguishes this case from those in which expert testimony has been required. *See Godfrey*, 559 F.3d at 573 (no expert testimony required where "the individual with supervisory authority (Iverson) was *present* when his employee (his personal bodyguard Kane) committed the tortious acts"); *District of Columbia v. Tulin*, 994 A.2d 788, 797 (D.C. 2010) (no expert testimony required where police sergeants were on the scene and authorized arrest without inquiring into "critical information" about the incident).

Indeed, the undisputed facts in this case demonstrate that Sergeant Suber, one of the District's supervisory officials, directed his subordinates to make an arrest that he should have known was unsupported by probable cause. That is sufficient to entitle the Plaintiffs to judgment as a matter of law on their negligent supervision claim. *See Phelan v. City of Mount Rainier*, 805 A.2d 930, 937-38 (D.C. 2002) ("To establish a cause of action for negligent supervision, a plaintiff must show: that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." (internal quotation marks omitted)).

\* \* \*

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*

BROWN, *Circuit Judge*, dissenting:

The court today articulates a broad new rule—one that essentially removes most species of unlawful entry from the criminal code. Officers must *prove* individuals occupying private property know their entry is unauthorized; otherwise police lack probable cause to make arrests. Moreover, any plausible explanation resolves the question of culpability in the suspects' favor. Thus, unless the property is posted with signs or boarded up and attempts to prevent access have been deliberately breached, *i.e.*, there is direct evidence of unauthorized entry, law enforcement's options are limited to politely asking any putative invitee to leave.

I respectfully dissent.

# I

Summary resolution is inappropriate where—as here—the probable cause determination turns on close questions of credibility, as well as the reasonability of inferences regarding culpable states of mind that officers draw from a complicated factual context. *See Media Gen., Inc. v. Tomlin*, 387 F.3d 865, 871 (D.C. Cir. 2004) ("[Where] the material facts are susceptible to divergent inferences . . . the [] Court ha[s] no basis upon which to grant summary judgment.").

The Court concludes that, as a matter of law, no reasonably prudent officer could believe Plaintiffs entered unlawfully because the undisputed evidence shows an individual with (illusory) authority invited their entry, vitiating Plaintiffs' formation of the requisite intent. Maj. Op. at 11. Yet the mere presence of an invitation by one with ostensible authority is not dispositive if, under the totality of the circumstances, the officers could still conclude the suspects knew or reasonably should have known their invitation was against the will of the lawful owner. *See*

*Ortberg v. United States*, 81 A.3d at 308 (D.C. 2013). The absence of direct, affirmative proof of a culpable mental state is not the same thing as undisputed evidence of innocence.

The court relies on two primary precedents to raise the bar, but neither *Ortberg v. United States*, 81 A.3d 303 (D.C. 2013) nor *United States v. Christian*, 187 F.3d 663 (D.C. Cir. 1999) justifies the impossible standard for finding probable cause the court now proposes. Channeling Dr. Frankenstein, the court cobbles together a few recognizable parts to build a grotesque and unnatural whole. In *Ortberg*, the court recognized a bona fide belief in the right to enter as a defense to a charge of unlawful entry. *Ortberg* was not a probable cause case; it confirmed that all elements of unlawful entry, including requisite criminal intent, are necessary to sustain a conviction, while emphasizing that bona fide belief must have some reasonable basis. It is "not sufficient that an accused merely *claim* a belief of a right to enter." *Id.* at 309, n.12.

*United States v. Christian* does impose a higher probable cause standard but that case is distinguishable. First, *Christian* involved a specific intent crime. *See generally Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir. 1994) ("[A]n officer need not have probable cause for every element of an offense[,]. . . however, when specific intent is a required element of the offense, the arresting officer must have probable cause for that element."). Second, *Christian* did not require direct evidence. The court cited *Adams v. Williams,* 407 U.S. 143, 149 (1972), acknowledging that the circumstances surrounding an arrest may support the necessary inference of unlawful possession. *Christian*, 187 F.3d at 406. The problem with the government's argument in *Christian* was not the absence of direct proof of criminal intent, it was the absence of any evidence whatsoever of

unlawful possession. "[T]he officers [therefore] lacked probable cause to believe a crime had been committed." *Id.*

Today's decision undercuts the ability of officers to arrest suspects in the absence of direct, affirmative proof of a culpable mental state; proof that must exceed a nebulous but heightened sufficiency burden that the Court declines to specify. The Court's decision broadly extends *Ortberg* and *Christian* to apply standards designed for materially disparate contexts to the probable cause inquiry for general intent crimes. *Cf. Pierce v. United States*, 402 A.2d 1237, 1246 n.2 (D.C. Cir. 1979) ("Sentences out of context rarely mean what they seem to say."). As a result, the Court finds officers may only lawfully arrest suspects for unlawful entry where the officers have evidence affirmatively proving each element of an offense, including clear proof of what the suspect knew or reasonably should have known. *But cf.* 1 Corinthians 2:11 ("For who knows a person's thoughts except their own spirit within them?"). This is tantamount to an invitation to abuse vacation rentals or houses being marketed for sale or lease where prospective tenants can gain entry and retain or misappropriate a key or a lockbox combination, or leave a point of entry unsecured. Such a heightened threshold is not called for under our precedents. For general intent crimes, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams*, 407 U.S. 143, 149 (1972). The proper inquiry is not whether the element of knowledge was conclusively satisfied; it is instead whether, based on the totality of the circumstances, officers could reasonably believe Plaintiffs committed the offense of unlawful entry.

The Court concludes there was insufficient evidence to support arrest because the evidence that Plaintiffs were

invitees was uncontradicted, noting the presence of semi-nude dancing and the semi-furnished state of the home are consistent with Plaintiffs' contentions of their innocent attendance at a party. Maj. Op. at 15–16. A jury might credit Plaintiffs' depiction of events, their claims of innocent reliance upon a credible invitation, and conclude they lacked knowledge of the unlawfulness of their entry. However, for purposes of summary judgment, Plaintiffs' lack of knowledge must not be merely "consistent" with the evidence gathered by the police. Instead, Plaintiffs' lack of knowledge must be the only reasonable inference the officers could draw.

Here the totality of the circumstances could cause reasonable minds to question whether Plaintiffs were as blameless as the attendees of a Sunday brunch whose imprudent host has overstayed her lease. *Contra* Maj. Op. at 13 (finding this case indistinguishable from such a scenario). The officers responded to a call reporting illegal activity in a home at least some residents of the neighborhood knew to be vacant. As the officers entered, the partygoers' first response was to scatter into different rooms or hide. The house's interior was bare and in disarray; beyond fixtures or large appliances, it contained only folding chairs and food, and one room upstairs had a bare mattress and lighted candles—along with "females . . . that had provocative clothing on with money in . . . their garter belt[s]." Parker Dep. 14:12–16.[1]

After rounding up and interviewing the partygoers, the officers found their claim to lawful entry was an invitation

---

[1] The Court characterizes such minimalist furnishings as consistent with a new tenant. Maj. Op. at 16. But the sparseness of the house's decor is also consistent with a temporarily unoccupied home; a venue choice that reasonably discerning guests might find somewhat abnormal—though perhaps not conclusively so—for a run-of-the-mill house party.

from the house's supposed tenant, Peaches, who was "throwing a party." However, Peaches was not actually present when the officers arrived on the scene. The partygoers also gave inconsistent explanations for the party to which they had allegedly been invited. Some claimed to be attending a birthday party while others insisted it was a bachelor's party; in any event, none could identify the guest of honor.

When ultimately reached by telephone, Peaches admitted to inviting various partygoers, and claimed she had permission to enter, an assertion she quickly recanted in a series of conflicting answers she made to investigators before becoming evasive and hanging up. The officers also confirmed from the actual owner that the house had been vacant since its last resident's death, the current owner was attempting to rent the property out, and neither Peaches nor anyone else had the owner's permission to enter or use the premises.

The totality of the evidence does not need to show the officers' beliefs regarding the unlawfulness of Plaintiffs' entry were "correct or more true than false. A practical, nontechnical probability . . . is all that is required." *Texas v. Brown*, 460 U.S. 730, 742 (1983). The surrounding context may not convince a jury to find probable cause. But likewise, taken in the light most favorable to the officers, the facts are not so clear cut that no reasonable officer could believe the partygoers knew or should have known Peaches' invitation was not credible or that their entry into the home was not properly authorized.

This is not a case where officers "turn[ed] a blind eye toward potentially exculpatory evidence in an effort to pin a crime on someone." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th

Cir. 1999). Nor did officers lack "any" evidence Plaintiffs committed the offense of unlawful entry. *See Christian*, 187 F.3d at 667. The circumstances surrounding the arrest were sufficient to support the inference that the suspects knew or reasonably should have known their entry was unlawful.

"[T]he real key . . . [to probable cause] is how [an] observed transaction fits into the totality of the circumstances." *Jefferson v. United States*, 906 A.2d 885, 888 (D.C. 2006) (noting observation of a one-way transfer of an unidentified object can, in some cases, support probable cause for an unlawful two-way exchange of drugs for money). The officers did not ignore Plaintiffs' potentially exculpatory claims of invitation. *See Fridley v. Horrighs*, 291 F.3d 867, 874–75 (6th Cir. 2002) (officers may not ignore exculpatory facts that tend to negate an element of an offense). Instead, during the course of a fast-moving investigation, officers considered and investigated Plaintiffs' statements, and rendered a determination that their claims of bona fide good faith were insufficiently credible to overcome the surrounding facts and circumstances. *See Minch v. D.C.*, 952 A.2d 929, 937–38 (D.C. 2008) (noting police suspicion was reasonably based on appellant's evasiveness and equivocation, particularly in a fast-moving investigation).

The very purpose of a totality of the circumstances inquiry is to allow law enforcement officers to approach such ambiguous facts and self-interested or unreliable statements with an appropriately healthy dose of skepticism, and decline to give credence to evidence the officers deem unreliable under the circumstances. *Cf. Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts."). The Court's

holding to the contrary ensures that all but the most implausible claims of invitation must be credited and radically narrows the capacity of officers to use their experience and prudent judgment to assess the credibility of the self-interested statements of intruders who claim to have been "invited" and have not overtly forced their entry into a home.

In light of the facts known to the officers at the time of the arrests, summary judgment is unwarranted on the question of probable cause for unlawful entry. From their investigation, the officers knew the house was an unoccupied private rental dwelling, which would likely not require a sign or express warning forbidding entry. *See McGloin v. United States*, 232 A.2d 90, 91 (D.C. 1967). They further determined none of the Plaintiffs owned or rented the house; that the property was, in fact, vacant; and the true owner had provided neither the partygoers nor any tenants with permission to enter, *see Culp v. United States*, 486 A.2d 1174, 1177 n.4 (D.C. 1985) ("[T]he arresting officers' knowledge that the property is vacant and closed to the public is material to a determination of probable cause."). Plaintiffs' party was taking place in a home so sparsely furnished as to be consistent with a vacant building; the guests' immediate response to the presence of police was to run and hide, an action suggestive of consciousness of guilt; the partygoers gave conflicting accounts about "why" the party was being held; and they purported to rely on an invitation from a "tenant" who was not actually present. When reached by telephone the "tenant" gave conflicting accounts as to her own permission to access the home, finally admitted she lacked any right to use the house, and—upon further questioning—became evasive and yelled at officers before hanging up.

Based on this evidence, taken in the light most favorable to the officers, a reasonable person could disbelieve Plaintiffs' claim of innocent entry based on a credible invitation. *See Parsons v. U.S.*, 15 A.3d 276, 280 (D.C. 2011) ("[T]he informant's general credibility and the reliability of the information he or she provides are important factors in a probable cause assessment"); *see also United States v. Project on Gov't Oversight*, 454 F.3d 306, 313 (D.C. Cir. 2006) ("Evaluation of the credibility of witnesses must be left to the factfinder, and the need to assess the credibility of witnesses is precisely what places this dispute outside the proper realm of summary judgment."). A rational juror could find the officers reasonably believed Plaintiffs either knew, or should have known, Peaches' invitation was unauthorized and that use of the house was not otherwise permissible.

At its fringes probable cause is a nebulous construct. *See Jefferson v. United States*, 906 A.2d 885, 887 (D.C. 2006). ("The probable-cause standard is incapable of precise definition . . . because it deals with probabilities and depends on the totality of the circumstances."). In factually complex circumstances, like the present one, the probable cause inquiry requires weighing the credibility of statements from multiple parties and witnesses, and consideration of the reasonable inferences officers may draw from idiosyncratic facts. Resolution of such a credibility laden and fact specific inquiry is properly reserved for the jury. The Court errs in concluding such a case is appropriate for preliminary resolution at summary judgment. *See George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) ("[A]t the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts-these are jury functions, not those of a judge ruling on a motion for summary judgment. . . . Although a jury may ultimately decide to credit the version of the events described by [a

defendant] over that offered by [a plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment.").

More troubling still, by subverting the appropriate standard for probable cause, the Court effectively excises unlawful entry from the District's criminal code for cases where intruders claim they were invited and have not obviously and forcibly obtained entrance to a currently unoccupied private dwelling. Such a conclusion is not compelled by either our case law or common sense; officers are simply not required to credit the exonerating statements of suspected wrongdoers where the totality of the circumstances suggests such claims should be treated with skepticism.

## II

Even assuming Plaintiffs' arrests were not supported by adequate probable cause for unlawful entry, qualified immunity shields the officers from individual liability for Plaintiffs' section 1983 claims because the officers' "conduct [did] not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added); *see also DeGraff v. D.C.*, 120 F.3d 298, 302 (D.C. Cir. 1997) ("[T]he scope of qualified immunity must be evaluated using the [] 'objective reasonableness' criteria.").

For purposes of qualified immunity, "'[c]learly established' . . . means that "[t]he contours of the right must be sufficiently clear that a reasonable [officer] would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). While, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has been

previously held unlawful," *id.*, courts should nonetheless "examine the asserted right at a relatively high level of specificity, and on a fact-specific, case-by-case basis," *O'Malley v. City of Flint*, 652 F.3d 662, 668 (6th Cir. 2011). And in reviewing the pre-existing law, the officers' "unlawfulness must be apparent" to support a finding that qualified immunity does not apply. *Wilson*, 526 U.S. at 615; *Wardlaw v. Pickett*, 1 F.3d 1297, 1301 (D.C. Cir. 1993) (suggesting the "unlawfulness of the defendants [must be] so apparent that no reasonable officer could have believed in the lawfulness of his actions").

Here the pre-existing law of unlawful entry is not so clear that a reasonable officer would have known he lacked probable cause to arrest Plaintiffs. The officers were faced with an unusual factual scenario, not well represented in the controlling case law. The property where Plaintiffs were found was somewhere between an occupied private dwelling and a vacant or abandoned building. The situation the officers encountered rests uneasily between two distinct strands of District law. *Compare McGloin*, 232 A.2d at 91 ("[N]o one would contend that one may lawfully enter a private dwelling house simply because there is no sign or warning forbidding entry.") *with Culp*, 486 A.2d at 1177 (noting boarded windows gives sufficient warning an abandoned building should not be entered).[2]

Neither line of cases unambiguously controls. The law of unlawful entry for abandoned properties has traditionally dealt with obviously decrepit buildings, *e.g., Culp*, 486 A.2d

---

[2] The Court finds it "important[]"there was no evidence the home's true owner told Plaintiffs they were not welcome. Maj. Op. at 11. It is unclear from the case law, however, such a warning is required for a temporarily unoccupied but not obviously abandoned residence. *See McGloin*, 232 A.2d at 90–91.

at 1175 (noting the house was missing a rear door, its windows were shattered, and the interior was in "shambles"), while unlawful entry of private dwellings has generally dealt with traditionally occupied residences, apartments, or semi-public buildings. *See, e.g., McGloin*, 232 A.2d at 91; *Bowman v. United States*, 212 A.2d 610, 611-12 (D.C. 1963). Neither line of cases encompasses a scenario where individuals claim to be the social guests of a tenant of a (vacant) property to which the tenant has no actual possessory interest—much less a scenario where the putative tenant is herself not present on the scene and refuses to otherwise cooperate with officers' ongoing investigation. Moreover, to the extent the pre-existing law is broadly comparable, a reasonable person could find it supports an officer's finding of probable cause where a trespassers claim of invitation is deemed insufficiently credible. *See, e.g.*, *McGloin*, 232 A.2d at 90–91 (upholding the conviction of person found in nonpublic areas of a private apartment building, despite his excuse he was looking for a cat or a friend who lived in the building); *Kozlovska v. United States*, 30 A.3d 799, 800–801 (D.C. 2011) (upholding the conviction of a woman who claimed an employee permitted her to use the building).

Thus, in the absence of pre-existing case law clearly establishing the contours of Plaintiffs' rights, the officers were shielded by qualified immunity when, acting under color of state law, they reasonably arrested plaintiffs for unlawful entry. The case law of course requires officers to have some evidence the alleged trespassers committed the offense of unlawful entry. *See* Maj. Op. at 21–22. Yet nothing in the District's law requires officers to credit the statement of the intruders regarding their own purportedly innocent mental state where the surrounding facts and circumstances cast doubt on the veracity of such claims. The officers were therefore entitled to the protection of qualified immunity and

the "breathing room" it gives them to make reasonable—albeit potentially mistaken—judgments under novel circumstances unexplored by the law when they took the challenged action. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).